23-6210, Mr. Rapucci, wow, okay, good, okay, good, good, good, good, good, good, good, good, good, good morning, my name is Jonathan Rapucci. I'm appearing on behalf of Cameron Watkins, the appellant in this case. I'd like to start with just the very basic fundamental realities of what happened on the night when police went to Mr. Watkins' motel suite. Unequivocally, they were searching for someone who matched the carjacking victim's description of a suspect. So I believe it's important to begin with the basic premises that a search was, in every practical sense of the word, occurring. The question presented is whether the search of Mr. Watkins' motel bedroom was illegal when it involved the officer entering the dead space area without any outlet to peer through a very small gap and drawing curtains into a bedroom in the middle of the night. The governing Supreme Court cases Jardinez and Collins are clear that the space immediately outside the front window of a residence constitutes curtilage and thus a constitutionally protected part of the home for Fourth Amendment purposes. This case must be viewed consistently with those cases which frame and control the analysis. The government seems to be asking for the extreme position that the entire exterior of the motel suite, including the space just outside the bedroom window, was an open field rather than curtilage, simply because it was a motel with shared outdoor spaces. Well, it's not open field, it's common area is the exception we're talking about. Whether it was a common area for the occupants of the hotel or not. Open fields conveys a different situation, I think. You don't think that this porch that went along the rooms was a common area? Well, I think it's really important to be very clear about what section of that porch we're talking about. And I think the exterior corridor along past most of the rooms there on the balcony is a common area. But you know that the images in the opening brief and the answer brief do a really good job of kind of showing the court this area. So it wasn't common area because other occupants of the hotel rooms couldn't walk along that corridor to the end? To look to see if their car was okay in the parking lot, or they wanted to take a smoke, or they just wanted a little exercise. The other occupants could not use that part of the corridor? No, I think the occupants could use that, I mean they could walk there, they could check their car, I think that's exactly what it would be used for. Well then why isn't it a common area and therefore not curtilage? Well, because it's off the path, right? It's off the path to the room. The path goes to the door, the path goes to the other rooms, the path doesn't go to that area. And I think just because it may be publicly accessible doesn't necessarily mean that it isn't curtilage. The porch on my house is publicly accessible to the mailman, but it's still curtilage. And so I think you can have both, I think you can have public access but also curtilage to the room. Would you, the officer also looked into the first window, which wasn't at the end of the walkway, it was before he came to the door, right? He also looked in that window and didn't see anybody or anything, right? I think that's correct. But had he looked, if you change it and we have a different scenario and he looked in that window, the curtains were closed except for about an inch. That's the scenario. Would your argument, would you still be making the same argument because it's the, you know, stepping into that space right in front of the window and peering into the window, especially with closed curtains? I think in that hypothetical, it would be a closer case. I think that certainly, as Judge Arch indicated, you know, the exterior to the other rooms does seem to be a more common area. And certainly people are going to be walking to their rooms. Does the common area include the space right up in front of the window that leads into the room? Well, I think not. I think not. And I think that, I think that Jardines and Collins, to a lesser extent, really has to control that analysis. I mean, the Supreme Court specifically used the words, the area in front, right next to the front window. And I think, you know, the Supreme Court chooses its words very carefully. And I think it's necessary that we have to presume that they meant what they said. And it makes sense, I think, also, because certainly people come to a porch, maybe come to the door. It's an entirely different thing, I think, for people to approach the window and look into it. And so I think that even— Aren't there a number of cases that allow officers to look, to stand right up against the window that's open and look in to see what's going on? I thought your argument with respect to the window related to the fact that it was just a small break in the curtain or shade. No, I'm not aware of many cases that authorize police officers to put their faces up to a window and peer through it. There are a lot of cases where if the curtains aren't drawn and the lights are on and you can see it from the yard or you can see it from the street, then that's a different scenario. You're talking about plain view from the—for instance, if it was plain view from this pathway, had the drapes been open on this pathway, even at the end, had the drapes been open and the officer could stand right there on the pathway, you're saying it would have been different. It would be a different case. And I think the evidence in the suppression hearing was that you could not see through the window from that path. And so, you know, the argument here is that that dead space area is curtilage. And to the extent that the court is inclined to disagree with that analysis, then I think there is a subset of curtilage there. And that's the area immediately approximate to the window. So you get three inches of curtilage? Well, I'm not aware of this distinction before, but I'm probably missing something. I'm not sure that was—I'm asking these questions. I'm not sure that was your argument in your briefing. I'm just trying to understand exactly what it is. You know, it may be to some degree a matter of inches, but I think we have to take this case as we find it. And that's that there was a one-inch gap in the curtain. And, you know, this is, you know, switching for a minute beyond the curtilage and the trespass test to the reasonable expectation of privacy. I think we could all agree that the area right outside of our bedroom window is really at the very core of the protections of the Fourth Amendment. I think anyone would have an expectation of privacy in that space, especially when they manifest that expectation of privacy by pulling the curtains closed. So all of the motel rooms have that, or just this configuration with the end of the hall? I suspect that all of the hotel—the rooms in the hotel have windows pertinent to the corridor. I don't know that. But this particular window, which was, you know, where the officer viewed Mr. Watkins inside, you know, on the bed, partially clothed with the gun. This particular window was a bedroom window, and it was in a section of the hotel that is not on the thoroughfare, if you will. And are you relying on that to say, couldn't look in that window, but could have looked in the neighbor's window? Or are you saying you can't look in any of the windows? Well, I think it would be a closer—again, I think it would be a closer case if it was one of the other windows. I think, you know, certainly if the shades are open, if the curtains are open and you're walking past, I think people do look, you know, into rooms. But I think it becomes a much closer case when the curtains are drawn almost, you know, almost tight. You know, the evidence in the record is it's one inch. That's a really small—it's a small divider in the curtain. And you would necessarily have to be awfully close to the window to be able to observe anything there. What's the case law? Do you have any Federal Circuit opinions making the distinction between an open window and a window covered by a shade through which you can look through a crack in the curtain? Or curtains lifted or whatever reason? I haven't found good case law on that that, you know, really ironed it out. And I think that probably is a function of, you know, the fact that these cases do have to be decided on their own facts. Certainly there's cases where—a case which I think opposing counsel had cited where the police officers were in the side yard and the curtain was open, I think, six inches perhaps, and the lights are on and the guys inside are packaging cocaine or something. Did you look at the two cases that were just supplemented? I did get a chance to see them. I didn't get a chance to thoroughly study them. What struck me about those cases, you know, I think they're distinguishable on their facts. One of them is a case from 2003, I believe, which certainly predates Jardinez. I think Jardinez did change the legal landscape here. And I think the second case is—strangely, I think it was actually decided just after Jardinez had been announced, but it doesn't reference Jardinez at all. And it's also a different case—I think that's the one that's a different case, too, because that's kind of walking along curtilage to view through a fence to look into curtilage. Here we've got walking on curtilage to look into the house, and so I think factually they're distinct. If I might reserve the rest of my time, I think I'd like to do that. Thank you. May it please the Court, Jacqueline Hutzel for the United States. The Supreme Court has been clear that simple visual observations from a public space are not a search and are not a violation of the Fourth Amendment. Here, Officer McNally saw with his unaided eyes the defendant holding a—with a gun and an extended magazine. He did so— This wasn't a simple visual observation, such as—I'm not sure what case you're talking about, but I'm not aware of a case like this where the officer isn't just standing in front of an open window with the blinds open or the curtains open, and he can see in. He's in a public place, and he can stand there, and he can see in. This is an officer going to the window, which is past the door—not going to the door, but going past, and even if it's public space, he's walking up. He's getting up to the window, standing on tiptoes, or maybe not standing on tiptoes, I guess, now, but he's walking up to the window, putting his face up to the window, and peering in between a one-inch crack. And that's not a simple visual observation. Well, a couple things, Your Honor, in response to that. I certainly understand your point. When I say simple visual observation, I'm meaning without any extraordinary measures, without any sort of device, right? He's not using binoculars. He's just using his unaided eye, and that's what I mean when I say simple visual observation. And also, to your point, I just want to say that I don't believe there's anything in the record that showed how close the officer had to get to the window, that he had to get close to it. There's nothing to say— Is there a photograph of him standing on his tiptoes, looking in? No, Your Honor. Respectfully, the—and counsel actually filed something last night. The photograph actually is showing the officer in front of the open door later on, not in front of the window. And if you watch the video itself, which is in the record, it's in the Supplemental Record, Government's Exhibit 1. If you watch the video, he's actually not even on his tiptoes. He's simply moving, so one of his feet looks like—makes it kind of look like he's on his tiptoes. But that's in front of an open door. It's not at the window at all. But he's not standing in the walkway just casually looking through an open window. Well, he was clearly— Not even close to that. He was clearly in the walkway looking through— Well, where else could he be? Right, right. Looking through the window. His nose is up to the window, right? Well, there wasn't any evidence that how close he had to get to the— All right. And clearly he could see easily into the window. Through a one-inch? Yes. If he focused through that one-inch crack in the— Yes, Your Honor. Yes, Your Honor. Okay. That's the simple visual observation? Yes, Your Honor. Okay. Yes. And I think that the courts, including the case that counsel referenced, Hardina's, was clear that officers are not required to shield their eyes when they're in a public space. And this is true even when the space itself is protected. So the Supreme Court told us that in Dunn and Serralo. You can see the court found that was curtilage. It was a backyard. The defendant there had gone to great measures to make two separate fences to keep anyone from looking outside. And the fact that the officers were in an airplane in a public space made it not a search for them to look with their unaided eyes into the backyard, which was a protected space. Similar, we see in Reeves and Cousins, even looking again into protected spaces. In Reeves, that was in a home, looking through a window. In Cousins, that was in the backyard. Was it an open window? Was it an unobstructed window? It was not unobstructed, Your Honor. It actually had bars on the window, and there was foliage on the outside. And the court there found that it was no search for them to look through that window. Did they part the foliage to look through? Is that why you mentioned the foliage? In that particular case, actually, the officer put a rifle through the foliage and through the bars of the window, so there was some sort of separation. But it was more difficult to see. There were measures that the homeowners had made to make it more difficult to look in the window. And I think that's important, too, that even measures don't change the analysis, right? Even if a resident puts up measures to keep someone from looking inside, like the fence in Serralo, like the foliage, the bars in Reeves. Also, in one of the cases, Elkins, that I submitted yesterday, there was actually a building. The gap wasn't even—it was a wall, not a window we're talking about. There was just a PVC pipe protruding, which created a small gap in the wall. And the Sixth Circuit found that there was no violation by the officers searching in that with their unaided eye. And I think that's important to note, because here we do have curtains, right? They were only open an inch. If you look at the video, the officer may have been holding his hands further apart than an inch, but a small amount of space that the curtains were open. But the measures that the resident makes doesn't change the analysis, because what we're looking at is whether or not there was a reasonable expectation of privacy. And the fact that this space was public is really important. And it's different than in Hardin is, where it was a front porch, right, of a private residence. Because this was a motel, and motels are different. And we see that in the case law that has been cited. So a private home, you have exclusive enjoyment. But if you get to, say, an apartment building where you're looking at multi-units, then you have shared space, you have common space. And that's going to change the analysis, right? But then in a motel, not only do you have shared spaces, you have common spaces, but you also have transient occupants. And I think the importance of it being a motel and that being a public space is really, really significant in this case. And you can see the difference of that motel versus the private home in Hardin is where they said it was a dog sniff on a front porch. And the Supreme Court said, although they said you don't have to shield your eyes, they said that the dog sniff was too much. Because that was cartilage. There was a reasonable expectation of privacy. But in Lewis, which is a case from the Seventh Circuit, we have a motel. And they're looking at the same thing. They're looking at a dog sniff in that case. And they found that just like in the case here, it's an open-air hallway. There are exterior stairs right by the hotel room that go to the parking lot, just like we have here. And it found there that the dog sniff was not a search because a motel occupant has no right to exclude others from that hallway, from that exterior space. And I think that's really important here because that space was public space. Someone could be looking for their car. Nobody's suggesting at all that there wasn't a right to access that hallway. It's the extent of the public license to come into that space. And I don't think that's what the defendant is arguing, at least, that they can't access the hallway. They can see that. But that doesn't necessarily give them the license to go past the door and go right up to the window and peer inside the window through a crack in the curtains. Right. Well, I think the idea being the reasonable expectation of privacy, and I think it being a space that the public could have access to, that someone inside a room. Has a reasonable expectation of privacy when they close their blinds in their motel room, in their bedroom. And they do not have an expectation, a reasonable expectation that someone, anyone, any member of the public could come along and just peer inside and see if they're doing anything at all in there, much less anything illegal. Yes, I think the difference is that the defendant didn't completely close the blinds. And if there is a reason. If you got these blinds, like we all know about, that you're trying to close, and they just won't stay that one inch, and you're pulling them over like I do in my hotel room, it's my fault? Well, I think. That somebody can come and try to peer in and see what I'm doing in there? Right. I certainly understand your concern. And I've spent a lot of time specifically thinking about this one inch gap. First off, it's not like a blinds where one part was just crooked, right? It's curtains and it's a one inch or a little bit more all the way down, right? One inch. Yes, all the way down. But I think it's important that it's visible from both sides, right? The defendant has every reason to know that his curtains are not all the way closed. And perhaps he even had them partially open so he could see what was going on outside. But I do think that in a motel where you know specifically that you can't keep people from being outside of your room, that you might have smokers, you might have people looking at the parking lot. You might have the air conditioner repairman, which is right there. If you can't keep those people out, there's no reason to expect that those private citizens wouldn't look and glance and see you sitting there with the gun. And I think that there's no reason. Also, I think it's very difficult. I think this is one of the reasons why. So it depends. It totally depends on what's reasonable depending on how good the drapes close. Is that what you're saying? Well, I think it does matter how closed they are. You just can't keep that gap closed. You don't have an expectation. I think we're getting off track here. Well, maybe. I'm not blaming you. No, because you keep talking about reasonable expectation of privacy. I don't think we examine in each of these cases whether it was reasonable for the occupant of the room to think his privacy was protected because of what he or she had done. As I understand the governing law, if an officer has a right to be where he is, he can use his senses to see anything without violating the other person's right as long as he doesn't use infrared stuff for cameras or radar or things like that. So the question here is, did the officer have a right to be right in front of the window? And if it was curtilage, perhaps not. I don't see why it's not a common pathway, so he had a right to be there. And then whatever he can see with his eyes, whether it's the occupant's fault or it's some defect in the blinds or something like that, is irrelevant. It's what the officer can see unaided. And by focusing on reasonable expectation of privacy, you make us consider all these different factors that, as far as I can tell, aren't relevant in the Supreme Court's jurisprudence. I may be missing something, but you keep focusing on reasonable expectation of privacy. You're correct, Your Honor. And that's specifically to address Judge Moritz's concern. And I think the idea, when I'm saying reasonable expectation of privacy, I'm talking about society, whether or not society recognizes a reasonable expectation of privacy. And what I think it's important about, to your point, is that that's why an officer in a public space that can just use his unaided eyes to see is why society doesn't recognize that privacy as a reasonable expectation. So that's what I was getting at there. OK. And it's because it's curtilage, though, right, that you? If it was curtilage, which I don't believe that it was. If it was curtilage, right. Yes, Your Honor. Yes, Your Honor. If there are no further questions, I would request that we affirm, and I would concede my time. Thank you. Thank you. Thank you. You know, I think it is, and I don't want to repeat myself too much, but it really is essential that this court view this case through the lens of Jardinez. And here, you know, there's two separate challenges on the Fourth Amendment. There's the reasonable expectation of privacy. There's also the trespass test. Both of those, in my opinion, lead way in favor of Mr. Watkins' position. You know, I think that it's not quite right to say that just because an officer can be present in that location that there's not a reasonable expectation of privacy. Well, Jardinez, the officers didn't have a right to be there, right? Well, that's right, because the scope of. So that would be the same situation as if we determined that the pathway in front of the motel rooms was curtilage. So I don't see how once we've decided it's not curtilage, what does Jardinez tell us? Well, I think what Jardinez tells you is that it is curtilage. Okay. So, okay. That's the point of deciding that. Not. Okay. Good. We're on the same. Right. I understand. Right. And so I think it is important, though, to recognize, too, the public access and the scope of whatever license there may have been, right? I mean, that particular space, had it been, I would expect that somebody like Mr. Watkins or me in my younger days, if I was staying in a suite like that, I'd be awfully excited to realize that I had porch space. I'd bring a chair out there. I might read a book. I might drink a beer. I'm not a smoker, but if I was, I'd smoke cigarettes. And so I think that area generally could be, I mean, I think that's a benefit of that suite. That's a benefit of a corner suite. It's nicer than the other rooms, and presumably it costs more. And so the license that an officer might have to be there, I think it depends on the totality of the circumstances. I mean, sure, it's not blocked off, but the officer, you know, we're talking after midnight here in the middle of the night, and I think what the officers could have done here, you know, they had a lot of options short of going on to that space and looking in the window. They could have. Do we really consider in determining the validity of a search whether the officers had other options? I think so. I think we do. Do you have a case where that comes up? Well, the knock and talks, right? Officer has a license to go do a knock and talk. That's not what happened here, right? They could have done that. They could have called the unit and asked Mr. Watkins to talk to them. They could have surveyed the unit, wait for him to come out, but they didn't do that. They went past the door onto what I think is the curtilage, and they looked in the window. And, you know, obviously the facts of the record are one inch. You know, it is hard to imagine much of a peripheral view from one inch, and so, you know, it's not like they could see the whole room. I think I'm out of time. You are. Thank you, Captain. Thank you.